# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SHILPA PHARMA, INC.,

        Plaintiff,

    v.

NOVARTIS PHARMACEUTICALS
CORPORATION,

        Defendant,

        -and-

NOVARTIS PHARMACEUTICALS
CORPORATION,

        Defendant-Counterclaim
        Plaintiff,

    v.

SHILPA PHARMA, INC.,

        Plaintiff-Counterclaim
        Defendant

        -and-

SHILPA MEDICARE LIMITED; VIMAL
KUMAR SHRAWAT; VEERESHAPPA;
VINOD KUMAR SINGH; PRASHANT
PUROHIT; AKSHAY KANT
CHATURVEDI; and INDIVIDUAL A,

        Counterclaim Defendants.

C.A. No. 21-558-MN

**JURY TRIAL DEMANDED**

## DEFENDANT NOVARTIS PHARMACEUTICALS CORPORATION'S
## AMENDED ANSWER, DEFENSES, AND COUNTERCLAIMS

Defendant Novartis Pharmaceuticals Corporation ("Novartis"), by and through its attorneys, respectfully submits its Amended Answer, Defenses, and Counterclaims to the Complaint filed by Plaintiff Shilpa Pharma, Inc. ("Shilpa Pharma") on April 20, 2021 ("Complaint"). Novartis's Amended Answer responds in numbered paragraphs corresponding to numbered paragraphs of the Complaint, and in doing so denies the allegations of the Complaint except as otherwise specifically stated.

The headings and subheadings in this Amended Answer are used solely for purposes of convenience and organization to mirror those appearing in the Complaint. To the extent that any headings or other non-numbered statements in the Complaint contain or imply any allegations, Novartis denies each and every allegation therein.

## NATURE OF THE ACTION

1.      Paragraph 1 contains conclusions of law to which no response is required.  To the extent a response is required, Novartis denies the allegations of Paragraph 1.

## PARTIES

2.      Novartis admits Paragraph 2, on information and belief.

3.      Admitted.

## JURISDICTION AND VENUE

4.      Paragraph 4 contains conclusions of law to which no response is required.  To the extent a response is required, Novartis denies the allegations of Paragraph 4.

5.      Admitted.

6.      Novartis does not contest that the Court has personal jurisdiction over Novartis in this matter.  Novartis denies the remaining allegations of Paragraph 6.

7.      Novartis does not contest that the Court has personal jurisdiction over Novartis in this matter.  Novartis denies the remaining allegations of Paragraph 7.

8.      For purposes of this action only, Novartis does not contest venue.   Novartis denies the remaining allegations of Paragraph 8.

## THE PATENT IN SUIT

9.      Novartis admits that the 816 Patent on its face purports to be entitled "Fingolimod Polymorphs and Their Processes," and was issued on February 23, 2016 naming inventors Vimal Kumar Shrawat, Veereshappa, Vinod Kumar Singh and Prashant Purohit.  Novartis admits that the 816 Patent on its face purports to be based on the 207 Application.  Novartis admits that the 816 Patent on its face purports to be based on PCT Appln.  No.  PCT/IN2011/000586.  Novartis admits

3

that Exhibit A purports to be a copy of the 816 Patent. Novartis denies the remaining allegations of Paragraph 9.

10. Without further information, Novartis is unable to confirm the allegations of Paragraph 10, and on that basis, denies those allegations.

11. Novartis admits that the 816 Patent purports to disclose crystalline polymorphic forms of fingolimod HCl α-, β-, and μ processes for the preparation thereof. Novartis admits that fingolimod hydrochloride has the IUPAC name of 2-amino-2-[2-(4-octylphenyl)ethyl]propane-1,3-diol hydrochloride and can be represented by the figure shown. Novartis denies the remaining allegations of Paragraph 11.

12. Novartis admits that fingolimod is a sphingosine 1-phosphate receptor (S1PR) modulator. Novartis denies the remaining allegations of Paragraph 12.

13. Denied.

## ACTS GIVING RISE TO THIS ACTION

14. Admitted.

15. Novartis admits that it has marketed the Gilenya® 0.5 mg and 0.25 mg products after each was approved by the FDA. Novartis denies the remaining allegations of Paragraph 15.

16. Novartis admits that Gilenya® is listed in the FDA's "Approved Drug Products with Therapeutic Equivalence Evaluations" online.

17. Novartis admits that the Orange Book lists the 283 patent, the 405 patent, and the 179 patent for the 0.50 mg Gilenya product. Novartis admits that the Orange Book lists the 208 patent for the 0.25 mg Gilenya product. Novartis denies the remaining allegations of Paragraph 17.

4

18.     Novartis admits that fingolimod is discussed in the 229 patent, which issued February 18, 1997, and is entitled "2-Amino-1,3-Propanediol Compound and Immunosuppressant."   Novartis denies the remaining allegations of Paragraph 18.

19.     Admitted.

20.     Novartis admits that a judgment of infringement of one or more of the 229 patent claims was ordered against each of the named entities in Paragraph 20.

21.     Admitted.

22.     Novartis admits that it filed an Application for Patent Term Extension of the 229 patent in November of 2010.   Novartis states further that that Application speaks for itself. Novartis denies the remaining allegations of Paragraph 22.

23.     Denied.

24.     Novartis admits that Example 28 of the 229 patent describes, inter alia, a preparation of 2-Amino-2-[2-(4-octylphenyl)ethyl]-1,3-propanediol, and Example 29 describes, inter alia, a preparation of 2-Amino-2-[2-(4-octylphenyl)ethyI]-1,3-propanediol hydrochloride. Novartis denies the remaining allegations of Paragraph 24.

25.     Novartis admits that Novartis Europharm Ltd submitted on 22 December 2009 an application for Marketing Authorisation to the European Medicines Agency (EMA) for Gilenya, which contained scientific and clinical information about Gilenya and its uses.   Novartis admits that the February 17, 2011 Assessment Report for Gilenya by the EMA states that "fingolimod hydrochloride exhibits polymorphism.   The active substance used for Gilenia [sic] is the polymorphic form I which is stable under the storage conditions specified in the SmPC and is routinely controlled in the specifications."   Novartis denies the remaining allegations of Paragraph 25.

5

26.     Admitted.

27.     Denied.

28.     Denied.

### DEFENDANT'S INFRINGEMENT OF THE 816 PATENT

29.     Paragraph 29 contains conclusions of law to which no response is required.   To the extent a response is required, Novartis denies the allegations of Paragraph 29.

30.     Without further information, Novartis is unable to confirm the allegations of Paragraph 30, and on that basis, denies those allegations.

31.     Without further information, Novartis is unable to confirm the allegations of Paragraph 31, and on that basis, denies those allegations.

32.     Without further information, Novartis is unable to confirm the allegations of Paragraph 32, and on that basis, denies those allegations.

33.     Denied.

34.     Denied.

35.     Denied.

36.     Denied.

37.     Denied.

38.     Novartis admits that Wang states that "[t]hree different polymorphs (I–III) were disclosed in a patent published in 2010 based on powder X-ray diffraction (PXRD) and differential scanning calorimetry (DSC)" and cites to WO 2010/055028.   Novartis denies the remaining allegations of Paragraph 38.

6

39.     Without further information, Novartis is unable to confirm the allegations of Paragraph 39, and on that basis, denies those allegations.

40.     Without further information, Novartis is unable to confirm the allegations of Paragraph 40, and on that basis, denies those allegations.

41.     Without further information, Novartis is unable to confirm the allegations of Paragraph 41, and on that basis, denies those allegations.

42.     Without further information, Novartis is unable to confirm the allegations of Paragraph 42, and on that basis, denies those allegations.

43.     Denied.

44.     Denied.

## COUNT ONE

### Infringement of the 816 Patent

45.     Novartis realleges and incorporates each of the Amended Answers to the preceding paragraphs as if fully set forth herein.

46.     Denied.

47.     Denied.

48.     Denied.

49.     Denied.

50.     Denied.

51.     Denied.

52.     Denied.

7

## RESPONSE TO PRAYER FOR RELIEF

No response is required to Shilpa's prayer for relief.  To the extent that a response is deemed required, Novartis denies that Shilpa is entitled to the relief it seeks or to any relief at all for the allegations made in the Complaint.  Novartis has not infringed any valid and enforceable claim of the 816 patent, and Shilpa is not entitled to any remedy or recovery.  Shilpa's prayer should therefore be denied in its entirety and with prejudice.

## DEFENSES

Novartis asserts the following defenses.  Assertion of a defense is not a concession that Novartis has the burden of proving the matter asserted or that the defense must be pled.  In addition to the defenses described below, Novartis expressly reserves the right to assert additional defenses as they become known through the course of discovery.

### <u>FIRST DEFENSE</u>

### (Non-Infringement)

1.      Novartis incorporates and re-alleges the allegations of the preceding Paragraphs as well as those of its Counterclaims below as if set forth fully herein.

2.      Novartis does not infringe, and has not infringed, directly or indirectly, any valid and enforceable claim of the 816 patent.

### <u>SECOND DEFENSE</u>

### (Invalidity)

3.      Novartis incorporates and re-alleges the allegations of the preceding Paragraphs as well as those of its Counterclaims below as if set forth fully herein.

8

4.      One or more claims of the 816 patent are invalid for failure to comply with one or more of the requirements of Title 35 of the United States Code, including but not limited to 35 U.S.C. §§ 102, 103, and 112, and for improper inventorship and derivation.

### THIRD DEFENSE

### (No Injunctive Relief)

5.      Novartis incorporates and re-alleges the allegations of the preceding Paragraphs as well as those of its Counterclaims below as if set forth fully herein.

6.      Shilpa is not entitled to injunctive relief, at least because the alleged injury to it is not immediate or irreparable, it has an adequate remedy at law for any alleged injury, and/or public policy concerns weigh against any injunctive relief.

### FOURTH DEFENSE

### (No Exceptional Case)

7.      Novartis incorporates and re-alleges the allegations of the preceding Paragraphs as well as those of its Counterclaims below as if set forth fully herein.

8.      Shilpa cannot prove that this is an exceptional case justifying an award of attorneys' fees against Novartis under 35 U.S.C. § 285 or otherwise.

### FIFTH DEFENSE

### (Unenforceability)

9.      Novartis incorporates and re-alleges the allegations of the preceding Paragraphs as well as those of its Counterclaims below as if set forth fully herein.

10.     The 816 Patent is unenforceable by virtue of Shilpa's inequitable conduct and unclean hands.

9

## SIXTH DEFENSE

### (Equitable Estoppel)

11.     Novartis incorporates and re-alleges the allegations of the preceding Paragraphs as well as those of its Counterclaims below as if set forth fully herein.

12.     The 816 Patent is unenforceable by virtue of equitable estoppel.

10

## COUNTERCLAIMS

Novartis, on personal knowledge as to its own acts, and on information and belief as to all other facts based on its own and its attorneys' investigation, hereby alleges Counterclaims against Shilpa Pharma, Shilpa Medicare Limited ("Shilpa Medicare"), Vimal Kumar Shrawat, Veereshappa, Vinod Kumar Singh, Prashant Purohit, Akshay Kant Chaturvedi, and Individual A (collectively, the "Individual Defendants"), as follows:

## THE PARTIES

1.  Novartis Pharmaceuticals Corporation is organized and existing under the laws of the State of Delaware, with its principal place of business in East Hanover, New Jersey.

2.  Shilpa Pharma, Inc. is a Pennsylvania corporation located at 1980 S Easton Rd., #220, Doylestown, Pennsylvania 18901.  Shilpa Pharma is a U.S. operating company for Shilpa Medicare.

3.  Shilpa Medicare Limited is an Indian corporation located at #12-6-214/A1, Hyderabad Road, Raichur – 584 135, Karnataka, India.  Shilpa Medicare touts itself as "one of the largest specialty generic pharmaceutical companies in the world."

4.  Shilpa Pharma and Shilpa Medicare (together, "Shilpa") develop, manufacture, market, distribute, sell, and/or import generic pharmaceutical versions of branded products throughout the United States, including in this judicial district.

5.  Vimal Kumar Shrawat is a named inventor on the 816 Patent; the former Chief Operating Officer of Shilpa Medicare; and is located in Raichur, India.  He has an M.Sc and a Ph.D. in Organic Chemistry.  He has over 25 years of experience working in large pharma industries like Ranbaxy/ Dabur Pharma- presently known as Fresenius Kabi Oncology Ltd.

6.  Veereshappa is a named inventor on the 816 Patent located in Raichur, India.

11

7.     Vinod Kumar Singh is a named inventor on the 816 Patent; currently is Associate Vice President, Analytical Research and Development at Shilpa Medicare; and is located in Raichur, India.  He has an M.Sc and a Ph.D in Analytical Chemistry, and experience working through various stages of drug discovery to API and drug product development.

8.     Prashant Purohit is a named inventor on the 816 Patent; currently is VP of Chemical Research & Development, Shilpa Medicare; and is located in Raichur, India.  He has an M.Sc. in Organic Chemistry and a Diploma in Business Management.

9.     Akshay Kant Chaturvedi led prosecution for Shilpa Medicare on the 816 Patent; is the former Head of IP (AVP-Corporate IPM & Legal Affairs) at Shilpa Medicare; and is located in Alwar, India.

10.     Individual A is a technician who signed an experimental report submitted with Shilpa's 132 declaration during prosecution.  His or her name is illegible on the document, which is why he or she is identified here only as "Individual A."

## JURISDICTION AND VENUE

11.     Novartis's claims arise under the Patent Laws of the United States, 35 U.S.C. § 100 *et seq.*; the Sherman Act, 15 U.S.C. § 2; the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; and State law.

12.     The Court has original jurisdiction over the subject matter of the Counterclaims pursuant to 28 U.S.C. §§ 1331, 1332, 1337, and 1338(a).

13.     The Court has supplemental jurisdiction over the State law claims under 28 U.S.C. § 1367, as the State and federal claims arise out of a common nucleus of operative fact.

14.     The Court has personal jurisdiction over Shilpa Pharma because it commenced and continues to maintain this action against Novartis in this judicial district and, by filing the Complaint in this action, has subjected itself to the jurisdiction of this Court.

12

15.     The Court has personal jurisdiction over Shilpa Medicare and the Individual Defendants because they purposely targeted this Country and District with anticompetitive conduct.  Shilpa Medicare and the Individual Defendants acquired the 816 Patent from the U.S. government by inequitable, false, and fraudulent means.  Representatives of Shilpa Medicare and Chaturvedi then sought to license the ill-gotten Patent to Novartis in 2016.  Shilpa Medicare and Chaturvedi knowingly assigned the rights in that Patent to Shilpa Pharma to assert against Novartis in this improper lawsuit.  Jurisdiction thus arises out of and/or relates to Shilpa Medicare's and the Individual Defendants' activities targeted at this Country and District.

16.     The Court further has personal jurisdiction over Shilpa Medicare based upon that company's privilege of doing business in Delaware, directly or indirectly through its subsidiaries (including Shilpa Pharma), agents, and/or alter egos.  Shilpa Medicare maintains pervasive, continuous, and systematic contacts with the State of Delaware, including the marketing, distribution, and/or sale of generic pharmaceutical drugs in Delaware.

17.     Personal jurisdiction also exists over Shilpa Medicare based on the agency relationship between Shilpa Pharma and Shilpa Medicare.  All of Shilpa Pharma's actions may be imputed to Shilpa Medicare as agent and/or alter ego.  Shilpa Medicare is directing and controlling Shilpa Pharma's conduct in this sham anticompetitive litigation.

18.     Alternatively, this Court may exercise jurisdiction over Shilpa Medicare and the Individual Defendants under Fed. R. Civ. P. 4(k)(2) because: (a) Novartis's counterclaims arise under federal law; (b) Shilpa Medicare and the Individual Defendants would be foreign defendants not subject to general personal jurisdiction in the courts of any State; and (c) Shilpa Medicare and the Individual Defendants have sufficient contacts with the United States as a whole, including, but not limited to, prosecuting the 816 Patent in the U.S., manufacturing and selling pharmaceutical products that are distributed throughout the United States, and through the

13

acquisition and transfer of rights in the 816 Patent to Shilpa Pharma and the direction that Shilpa Pharma bring the lawsuit to restrain the nation-wide market in rights needed to commercialize Gilenya.

19.     Venue is proper in this District for these Counterclaims under 28 U.S.C. § 1391 and 1400(b) because Shilpa Pharma has consented to venue in this District by filing this action and because Shilpa Medicare and the Individual Defendants are foreign residents that can be sued in any district.

## NATURE OF THE ACTION

20.     These Counterclaims arise from Shilpa's allegations of infringement of the 816 Patent.

21.     On April 20, 2021, at the direction of Shilpa Medicare, Shilpa Pharma filed an action alleging that Novartis infringes the 816 Patent either directly or indirectly through the manufacture and sale of Gilenya, the first solid oral medicine for relapsing-remitting multiple sclerosis ever approved.

22.     The 816 Patent's inventors originally assigned their rights in PCT/IN2011/000586 (the purported parent application to the 816 Patent) to Shilpa Medicare, as recorded with the USPTO at Reel/Frame 028985/0073.  Shilpa Medicare then assigned the 816 Patent to Shilpa Pharma at Reel/Frame 055059/0047 on January 21, 2021, apparently for the purpose of facilitating Shilpa Pharma's assertion of the 816 Patent against Novartis in this case.

## FIRST COUNTERCLAIM

### (Declaratory Judgment of Invalidity of the 816 Patent)

23.     Novartis restates and realleges the allegations of the preceding Paragraphs of its Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

14

24.     Each asserted claim of the 816 Patent is invalid for failure to comply with one or more of the statutory requirements of or conditions for patentability specified by Title 35 of the United States Code, including but not limited to 35 U.S.C. §§ , 102, 103, 112, 116 and/or 132.

25.     A definite and concrete, real and substantial, justiciable, and continuing case or controversy exists between Novartis and Shilpa about the validity of the 816 Patent's asserted claims.

26.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, Novartis requests the Court's declaration that the asserted claims of the 816 Patent are invalid.

27.     This is an exceptional case entitling Novartis to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## SECOND COUNTERCLAIM

### (Declaratory Judgment of Noninfringement of the 816 Patent)

28.     Novartis restates and realleges the allegations of the preceding Paragraphs of its Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

29.     Novartis denies infringement of any asserted claim of the 816 Patent and alleges that the manufacture, use, sale, offer for sale, or importation of any Gilenya product has not infringed, does not infringe, and would not, if manufactured, used, sold, offered for sale, or imported, infringe, either directly, indirectly, or contributorily, and would not induce infringement of, any asserted claim of the 816 Patent.

30.     A definite and concrete, real and substantial, justiciable, and continuing case or controversy exists between Novartis and Shilpa regarding the infringement of the 816 Patent.

31.     A judicial declaration is necessary and appropriate so that Novartis may ascertain its rights regarding the 816 Patent.

32.     Novartis is entitled to a judicial declaration that the manufacture, use, sale, offer for sale, or importation of any Gilenya product has not infringed, does not infringe, and would not, if manufactured, used, sold, offered for sale, or imported, infringe, either directly, indirectly, or contributorily, and would not induce infringement of, any asserted claim of the 816 Patent.

33.     This is an exceptional case entitling Novartis to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## THIRD COUNTERCLAIM

### (Unenforceability of the 816 Patent)

34.     Novartis restates and realleges the allegations of the preceding Paragraphs of its Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

35.     The asserted claims of the 816 Patent are unenforceable because of inequitable conduct and/or unclean hands committed by Shilpa Medicare, Shilpa Pharma, and the Individual Defendants during the prosecution of the 816 Patent and pursuit of this action, as explained herein.

**Introduction**

36.     Shilpa obtained the 816 Patent through fraud on the Patent Office and now seeks to use the 816 Patent to strong-arm Novartis.

37.     In 2010, Shilpa saw an opportunity.  Novartis had reported successful clinical trials for the use of the drug fingolimod (in hydrochloride form) to treat relapsing-remitting multiple sclerosis (RRMS).  The drug was set to become the first-ever solid oral treatment for the disease, help untold numbers of RRMS patients, and become a commercial success.  However, there was no patent on the solid crystal form of the drug that exists at room temperature—the only commercially useful form of the drug in a solid oral medicine.  Novartis disclosed that form in a published patent application (Mutz), calling it "Form I."  But Novartis abandoned any claims to Form I due to the drug's widespread use at room temperature in published research since the 1990s.

16

38.     Shilpa was not so constrained.   After FDA approved Gilenya in 2010, Shilpa applied to the U.S. Patent Office for a patent on crystal forms of the drug, including the only known room-temperature form.   Shilpa's application even referenced Mutz's disclosure of Form I as prior art, but pretended with the Patent Office that the Shilpa form was somehow different.   Then, during prosecution, Shilpa overcame a rejection by submitting knowingly misleading data on which the Patent Office relied, and further expanded the scope of the Patent's claims at the last minute in breach of prior representations  to the Patent Office and without notice of that breach.   In other words, Shilpa misled the Patent Office from start to finish.

39.     After the Patent Office granted the 816 Patent in February 2016, Shilpa wasted no time in contradicting itself.   Despite having told the Patent Office that the Shilpa Patent claimed a room-temperature form different than the known room-temperature form, Shilpa contacted Novartis within days after the Patent was granted and alleged the opposite—that the 816 Patent would cover generic fingolimod.   But Shilpa had not yet tested any of the other companies' drugs.   Thus, Shilpa could make that assertion only because it knew that fingolimod hydrochloride can persist at room temperature in only one form.   Shilpa suggested that Novartis could license the Patent to use against potential generic competitors.   Novartis declined, leading to this lawsuit, in which Shilpa asserts the 816 Patent knowing that it was obtained by fraud.

40.     The Complaint essentially admits Shilpa's fraud.   Shilpa cited Mutz in prosecution and contended that the Shilpa form was different than Form I.   The Complaint cites the same reference to argue exactly the opposite—that the Shilpa form is the same as Novartis's, and thus that Gilenya allegedly infringes.   For that reason and others shown below, Shilpa has committed unlawful inequitable anti-competitive acts, and must be held to account.

### Novartis's Development of Gilenya

41.     Japanese scientists at Kyoto University, Taito Sugar, and Yoshitomi Pharmaceuticals discovered fingolimod in the mid-1990s.  They derived the compound from a natural substance and then uncovered a unique mechanism by which the drug can suppress the immune system.  Fingolimod alters the trafficking of certain cells involved in an immune response, sequestering the cells in the lymph nodes and out of the blood stream.

42.     Throughout the 1990s, these Japanese scientists published extensively on the compound and its unique mechanism of action.  In addition, they were awarded a U.S. patent on the compound, U.S. Pat. No. 5,604,229.  Ultimately, in the late 1990s, Yoshitomi and Taito licensed fingolimod's patent rights to Novartis for further research and development.

43.     Novartis invested heavily in fingolimod as a potential advance in treating organ transplant rejection and, later, as a potential treatment for RRMS.  That effort resulted in an explosion of publications in the early 2000s, especially after the drug's molecular mechanism was identified.  Research had uncovered an entirely new molecular signaling pathway involved in multiple biological processes.  That discovery in turn spurred further research around the world.

44.     In addition to basic research, Novartis funded multiple clinical trials for the drug as an organ transplant or RRMS treatment.  That work, too, resulted in many publications.  While the transplant trials ultimately did not produce a good candidate for submission to the FDA, the RRMS trials did.  That development attracted significant attention, especially after positive Phase III results were announced in 2009.  If approved, fingolimod promised to be the first-ever solid oral treatment for RRMS.  All other approved treatments at that time were injected or infused into patients.

45.     Amongst the work done in developing Gilenya was to describe, or "characterize," fingolimod hydrochloride's "crystal polymorphs" at room and higher temperatures.  A polymorph

18

is a particular arrangement of molecules in a crystal substance. The same substance can have multiple polymorphs generated from differences in temperature, pressure, humidity, and other conditions.

46.     A drug's polymorphic structure can affect activity. As a result, pharmaceutical companies test polymorphs in the drug development process. Novartis scientists Michael Mutz and Guido Jordine did just that. They prepared, studied, and characterized fingolimod hydrochloride's polymorphs using various techniques.

47.     One technique is called "x-ray diffraction." That involves directing x-rays at a single crystal or a powder of the substance and then measuring how the rays diffract from the substance using a x-ray detector. Different crystal polymorphs produce different diffraction patterns, and experts in the field can interpret those patterns and infer the underlying atomic structure of a given polymorph (single crystal) orto infer the presence of one or more crystalline components (powder).

48.     Another technique is called "differential scanning calorimetry," or "DSC." This process involves measuring the amount of heat needed to raise the temperature of a substance. Just as with x-ray diffraction, different polymorphs respond to being heated in different ways, and experts in the field can interpret those signals to infer structural changes as a function of temperature.

49.     Mutz and Jordine used both techniques to study fingolimod hydrochloride polymorphs at different temperatures. Key parts of their results were set forth in a patent application published in 2009, WO 2010/055028 A2 (the "Mutz" reference). Mutz describes the three crystal polymorphs of fingolimod hydrochloride, Forms I, II, and III. Form I is stable and the only known form than can persist at room temperature. Form II is stable between 40° and 65°

19

C, and Form III is stable between 66° and 107° C.  Mutz further describes how Forms II and III can be cooled at room or lower temperatures and thereby transition back into Form I.

50.      While Novartis filed the Mutz application, it abandoned any claims to Form I—the room temperature form.  Fingolimod hydrochloride at room temperature had been in public use since the mid-1990s and thus was unpatentable.

51.      As a result of Novartis's copious research and investment, in September 2010 FDA approved the use of fingolimod hydrochloride as the first oral treatment for RRMS, under the trade name "Gilenya."  This was a huge advance for RRMS patients.

**Shilpa's Prosecution**

52.      Two months <u>after</u> FDA approved Gilenya, Shilpa filed a patent application in India on three alleged polymorphic forms of fingolimod hydrochloride, which Shilpa misleadingly labeled "alpha," "beta," and "mu."  Shilpa later filed internationally and in the U.S., Europe, and elsewhere under the Patent Cooperation Treaty (PCT).  The U.S. Application was U.S. Patent Application Ser. No. 13/635,207.

53.      Shilpa had Gilenya's anticipated success firmly in its sights.  Shilpa's claimed Form beta is the only form of fingolimod hydrochloride that can persist at room temperature.  If Gilenya turned out to be the breakthrough patient treatment commentators anticipated, then patent rights to Form beta could be used to hold-up Novartis and anyone else making or selling the drug—even though Shilpa had no role whatsoever in developing the drug, running the clinical trials, or otherwise helping patients.

**A.      Shilpa's Misrepresentations About Mutz**

54.      However, Shilpa had a problem.  Mutz had already disclosed the only known stable room-temperature crystal polymorph.  Multiple prior-art references confirmed that fact.

20

55. Shilpa knew about at least some of those prior art references but concealed them from the Patent Office. When Shilpa filed its PCT application, initial reviewing authority identified *twelve* potential novelty-destroying papers, called "X references." Among these were papers confirming that fingolimod hydrochloride had only one stable room-temperature form, Form I from Mutz. When Shilpa filed the U.S. application, the X reference list was included, but Shilpa selected only two of the X references to include in the Information Disclosure Statement (IDS) to the Patent Office, leaving ten off the list. This was Shilpa's first step in intentionally concealing material information from the Patent Office Examiner related to the fact that the only form stable at room temperature was Mutz's Form I, and thus that Shilpa's Form beta was not novel.[1]

56. Shilpa did identify Mutz in the application's specification, including the room-temperature Form I. But Shilpa pretended through misrepresentations and omissions that other forms could be stable at room temperature, when that was untrue. Shilpa simply never told the Examiner of Mutz's disclosure that, at room temperature, all forms revert to Form I, which is an intentional omission of material information to the patentability of the 816 Patent claims.

57. Rather than reveal these facts, Shilpa asserted that there "still appears to be a need for novel crystalline forms" with enhanced stability at room temperature, which Shilpa's

---

[1] Shilpa was represented in prosecution from 2010 to 2013 by Ming Chow, a U.S.-registered patent agent. During prosecution, Ming Chow's power of attorney was withdrawn and Shilpa proceeded pro se. Subsequently, the U.S. Patent Office, Office of Enrollment and Discipline (OED) found Ming Chow to have been knowingly facilitating the unauthorized practice of law before the Patent Office by subordinates. In stipulated findings, the OED found and Ming Chow agreed that the wrongful conduct had been occurring from 2006 to 2019, and thus during the period when Ming Chow represented Shilpa before the Patent Office. Further, Ming Chow admitted to having lied to OED during the investigation. As punishment, the OED suspended Ming Chow from practice before the Patent Office for a defined period. *See In re Ming Chow*, United States Patent and Trademark Office, Before the Director, Proceeding No. D2018-27 (April 30, 2019).

21

application purported to provide. Shilpa's adoption of the names "alpha," "beta," and "mu" was a material misrepresentation intentionally calculated to confuse the Examiner into believing that Shilpa's forms were different than Mutz's in order to achieve patentability of the 816 Patent claims. But at least with respect to Form beta, it was the same as Form I in Mutz.

58. The two forms exhibit the same essential x-ray diffraction pattern and DSC signal. The European Patent Office reached that exact same conclusion in rejecting Shilpa's attempt to obtain a European patent on Form beta. Nonetheless, in the U.S. prosecution, Shilpa intentionally misrepresented that Mutz Form I and Shilpa Form beta were different, only later to switch gears and allege the opposite when pursuing infringement claims here.

59. Each Individual Defendant knew that there is only one known stable polymorph that can persist at room temperature and that Form beta was identical to Mutz Form I. But each nonetheless withheld that information from the Patent Office, and the inventors submitted a declaration attesting that they had reviewed the specification's contents, including the description of Mutz. The quantitative measurements in the Shilpa specification for Form beta were essentially the same measurements as in Mutz for Form I. The statements about Mutz in the specification show that the inventors and Chaturvedi read Mutz, and each of course had a duty to be truthful in the specification or otherwise inform the Patent Office of information material to the examination of their application.

60. Indeed, Defendant Chatruvedi would later sign a response by Shilpa to a Patent Office rejection in 2015 asserting that "no prior art disclosed the specific conditions as claimed in the present patent application." Chatruvedi signed that document knowing that Mutz disclosed such conditions and that Mutz's Form I rendered the claims to Form beta unpatenable.

### B. Shilpa's Submission of Tainted Data

61. Shilpa's misrepresentations about Mutz were only the beginning.

22

62. During prosecution in 2015, the Examiner rejected Shilpa's proposed claims for a variety of reasons. Among these was a rejection for anticipation by "Kiuchi," an article published in 2000 by fingolimod's initial Japanese inventors and others.

63. Kiuchi describes a method for synthesizing fingolimod hydrochloride from other chemicals. As the Examiner pointed out in rejecting Shilpa's claims, "Kiuchi discloses a solid form or a crystalline form of Fingolimod [hydro]chloride. The [P]atent [O]ffice is not a scientific laboratory and thus ... cannot differentiate the forms in the claims from the forms in Kiuchi."

64. The stakes for Shilpa were high. By 2015, Gilenya was a confirmed and bona fide commercial blockbuster. U.S. sales were approaching $2 billion annually. The value to Shilpa of obtaining a patent could be immense.

65. Shilpa responded to the Examiner's rejection with an amendment and response on May 14, 2015. As part of the response, Shilpa submitted an inventor's declaration from Dr. Vimal Kumar Shrawat, which purported to attach an x-ray diffraction pattern comparison between Shilpa's Form beta and fingolimod hydrochloride as manufactured using the recipe in Kiuchi.

66. Dr. Shrawat and Shilpa knew that the Kiuchi process, if properly followed, would produce a sample containing Form beta. But Dr. Shrawat and others at Shilpa knowingly changed the Kiuchi process so that it would not result in pure Form beta. Shilpa prepared the sample at high temperatures not disclosed in Kiuchi but known (according to the disclosures in Mutz, for example) to result in forms of the drug different than what is stable at room temperature. Dr. Shrawat and other at Shilpa then performed an x-ray analysis without either cooling the sample at temperatures lower than room temperature or waiting for the sample to remain at room temperature long enough to change fully into the room-temperature form. That resulted in a sample containing a mixture of forms, which in turn would lead to an x-ray pattern that appeared not to contain Shilpa's Form beta, when in fact it did.

23

67.     Shilpa's purported recreation of the Kiuchi process included a step at 45-50° C, above the 40° C at which Mutz Form II forms.  Nowhere does Kiuchi mention a step in that temperature range.  Dr Shrawat and others at Shilpa then let the sample dry and cool at room temperature for only 4-5 hours before performing x-ray diffraction.  Shilpa, Shrawat, and Individual A intended to heat the process above what Kiuchi recited by intentionally adding in heating steps that are missing in the Kiuchi recipe.

68.     These persons at Shilpa knew that this process would produce a mixture of forms, but nonetheless represented that the sample had produced a single "form."  For instance, Mutz disclosed that samples should be cooled below room temperature to "ensure" pure room-temperature forms in a sample.  Shilpa's own specification likewise included such a cooling step.  And other art at the time confirmed that Forms II and III would transition to Form I at room temperature, though the process could be accelerated at lower-than-room temperatures.

69.     These persons at Shilpa knowingly chose not to allow the mixture it prepared to cool.  Thus, as these persons at Shilpa had planned, the diffractogram for the Kiuchi sample contained x-ray diffraction "peaks" that did not entirely overlap with Form beta's peaks, although most overlapped, indicating the presence of Form I.  Upon seeing that some Form I and Form beta peaks overlapped, Shilpa further tried to confuse the Examiner in presenting the data.  In the accompanying response to the rejection, Shilpa, in a document signed by Dr. Chaturvedi, set forth a table of key peaks for the Kiuchi and Form beta samples deliberately arranged to inhibit direct apples-to-apples comparison of similar peaks.  That table is reproduced below, with red arrows added to show peaks that can and should be directly compared.

24

| Crystalline Fingolimod obtained as per Kiuchi et al. | Intensity (Greater than 2 %) | Fingolimod Form β | Intensity (Greater than 2 %) |
|---|---|---|---|
| 3.2 | 31 | 3.54 | 100 |
| 3.6 | 100 | 7.07 | 4.7 |
| 7.1 | 3.8 | 10.66 | 11.1 |
| 10.7 | 5.8 | 15.35 | 3.7 |
| 21.5 | 3.3 | 20.52 | 4.6 |
| | | 21.43 | 8.0 |
| | | 25.10 | 2.2 |

70.     Shilpa then proclaimed that the table proved the "many" differences between the Kiuchi sample and Form beta. Likewise, Dr. Shrawat certified that "I believe that the powder X-ray diffraction analysis of the products obtained by reproducing the process disclosed in Kiuchi et al … show that neither of the product [sic] obtained in that experiment corresponds to the crystal form recited in the claims of the present invention."

71.     This combination of manipulations succeeded in convincing the Patent Office Examiner, who expressly relied on the Shrawat declaration and accompanying analysis in a reasons for allowance statement explaining why the claims had been granted:

**REASONS FOR ALLOWANCE**

The following is an examiner's statement of reasons for allowance:

In view of the amendment, the rejections and objections of record are withdrawn.

Applicant previously presented an affidavit distinguishing the instant polymorph from the art.

## C.     Shilpa's Deceptive Last-Minute Claim Amendment

72.     In the same rejection that had raised the Kiuchi reference, the Examiner had also rejected the claims, which identified the invention as "comprising" characteristic x-ray diffraction "peaks," as indefinite because they were insufficient to distinguish one form from another.

25

**Claim 7-12** is rejected under 35 U.S.C. 112(b) or 35 U.S.C. 112 (pre-AIA), second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which the inventor or a joint inventor, or for pre-AIA the applicant regards as the invention. The claims only require 4 peaks in an X-ray diffraction pattern. The specific peaks are insufficient to differentiate one form from another. For example other forms have similar peaks within the degree of error (see instant Figures for evidence).

73.     Shilpa then submitted claims with some narrowing on May 14, 2015, amending the claims to recite an XRPD pattern "consisting of" certain peaks. Prosecution continued with those narrowed claims until just before allowance.

74.     But at the 11th hour, in conflict with prior statements made to the Examiner, Shilpa went back on its prior representations about the claims. Shilpa—acting through Dr. Chaturvedi—submitted amendments that switched the "consisting of" amendment back to "comprising." But Shilpa and Dr. Chaturvedi did not alert the Examiner to how this new amendment conflicted with Shilpa and Dr. Chaturvedi's prior arguments. That action led the Patent Office Examiner not to scrutinize Shilpa's last-minute claim amendment, and the Patent Office granted the 816 Patent on February 23, 2016.

**Shilpa's Wrongful Assertion of the 816 Patent**

75.     The 816 Patent contains six claims. Claims 1-4 are relevant in this case. They purport to claim Form beta based on a combination of x-ray diffraction and DSC measurements. The Patent Office granted no other claims besides those to Form beta, and to putative methods of making that form (Claims 5 and 6).

76.     Tellingly, Shilpa stopped prosecuting its application as soon as the Patent Office agreed to these claims. Shilpa had no need for claims to forms alpha and mu, because its claims to Form beta, according to Shilpa, cover the stable polymorphic form of fingolimod hydrochloride

26

at room-temperature. Gilenya is the first solid oral drug to treat MS; the Gilenya capsules contain fingolimod hydrochloride and according to the drug label are sold, stored, and used at room temperature. Shilpa thus needed no more than claims to its Form beta to effectuate its scheme.

77.    Within days of the Patent Office granting the 816 Patent in February 2016, Shilpa contacted Novartis and claimed the Patent would cover generic fingolimod. Specifically, Shilpa's outside counsel Mr. Chid Iyer of the Sughrue Mion PLLC law firm contacted Novartis's in-house counsel Peter Waibel. Mr. Iyer told Novartis in the first phone call in February 2016 that Shilpa believed the 816 Patent would apply to generic fingolimod. Mr. Iyer made these statements even before even Shilpa had tested generic fingolimod for the presence of the claimed Form beta. Testing was not needed—Shilpa already knew that fingolimod hydrochloride has only one known stable crystal form at room temperature, the temperature at which the drug is sold and used. That is Mutz Form I, which Shilpa misleadingly labeled Form beta. Thus, in alleging that generic fingolimod hydrochloride would contain Shilpa's claimed polymorph, Mr. Iyer was admitting that Shilpa's representations to the Patent Office about the differences between Mutz's Form I and the claimed Form beta had been false.

78.    The fraud continued. On March 16, 2016, Mr. Iyer, Dr. Chaturvedi, and two other Shilpa representatives met with Novartis personnel to discuss the 816 Patent. At least as a result of that conversation, at least Dr. Chaturvedi and likely other Shilpa representatives at the meeting knew that Mr. Iyer had suggested that the 816 Patent covered generic fingolimod hydrochloride. Neither Dr. Chaturvedi nor any other Shilpa representative intervened in the March 2016 meeting to correct or otherwise amend Mr. Iyer's alleged statement.

79.    Shilpa further failed to take steps to allow Novartis and the Court ensure that all evidence of the fraud had been preserved. Shilpa claims that the 2016 communications allegedly put Novartis on notice of Shilpa's allegations regarding the 816 Patent, and thus that Shilpa was

27

contemplating litigation against Novartis as early as February 2016. Despite that alleged intent, and despite being an experienced U.S. litigant advised by U.S. litigation counsel, Shilpa never issued a legal hold notice directing employees to retain data related to the patent, its prosecution, or the alleged potential case against Novartis.

80.     When Shilpa finally instituted this lawsuit in April 2021, the Complaint further confirmed the extent of Shilpa's fraud on the Patent Office. In particular, Shilpa alleges now— exactly opposite to its representations to the Patent Office—that Mutz Form I is the same as Shilpa's Form beta, as confirmed by intervening art (the "Wang" reference). Mutz presented x-ray diffractograms that correspond to Shilpa's diffractograms for Form beta in the 816 Patent. Thus, Wang and Mutz confirm that Shilpa's statements to the Patent Office about an allegedly novel Form beta were a sham designed to elicit a patent as part of a shakedown scheme to profit from an important medicine to which Shilpa contributed nothing.

81.     Accordingly, in view of the foregoing, Shilpa has forfeited the right to enforce the 816 Patent. At all relevant times, Patent Office regulations provided that every individual associated with the filing and prosecution of a patent "has a duty of candor and good faith in dealing with the [Patent Office], which includes a duty to disclose to the [Patent Office] all information known to that individual to be material to patentability." 37 C.F.R. § 1.56(a). Shilpa, its inventors including Dr. Shrawat, and its patent counsel Dr. Chaturvedi, and Individual A, egregiously violated this duty of candor and committed inequitable conduct. Thus, Shilpa is tainted by unclean hands, and should be foreclosed from enforcing the 816 Patent.

82.     Every element of inequitable conduct has been met, more than once. Acting on Shilpa's behalf, each of the Individual Defendants made numerous material misstatements and/or omissions with the specific intent of deceiving the Patent Office. In fact, the Patent Office was

deceived and expressly or impliedly relied on those misstatements and/or omissions in granting the 816 Patent. The 816 Patent accordingly is unenforceable.

## FOURTH COUNTERCLAIM

### (Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 – *Walker Process* Fraud and Sham Litigation)

83.     Novartis restates and realleges the allegations of the preceding Paragraphs of its Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

84.     In addition to amounting to inequitable conduct, Shilpa's conduct described above represents an unlawful scheme to obtain an illegal monopoly in the United States in the market for the technology needed to commercialize Gilenya, orchestrated by Shilpa Pharma, Shilpa Medicare, and the Individual Defendants.

85.     Shilpa and the Individual Defendants committed fraud and/or inequitable conduct before the United States Patent Office to obtain the 816 Patent. Shilpa then proceeded to file an objectively baseless lawsuit against Novartis in bad faith, knowing that its patent is invalid, unenforceable, and procured by fraud, for the improper purpose of harming Novartis and reducing or eliminating competition in the relevant market. Because the 816 Patent purports to cover the only known crystal form of fingolimod hydrochloride required to be used in Gilenya and generic equivalents, Shilpa has an effective monopoly on the market to commercialize those drug products. No company could provide Gilenya or a generic equivalent without licensing or infringing Shilpa's 816 Patent.

### Shilpa's Fraudulent Conduct

86.     As explained in Novartis's Third Counterclaim above (incorporated herein by reference), Shilpa and the Individual Defendants engaged in a deliberate and ultimately fraudulent pattern of omitting material information and submitting false and misleading information to the Patent Office that resulted in the issuance of the 816 Patent.

29

87. This fraudulent conduct includes blatantly omitting material information relating to and mischaracterizing the prior art in the 816 Patent, submitting a false and misleading comparison of the claimed crystal form to a prior art crystal form applied by the Examiner to reject the claims, and concealing prior representations to the Patent Office in expanding the claims' scope at the last moment.

88. At all relevant times, Patent Office regulations provided that every individual associated with the filing and prosecution of a patent "has a duty of candor and good faith in dealing with the [Patent Office], which includes a duty to disclose to the [Patent Office] all information known to that individual to be material to patentability." 37 C.F.R. § 1.56(a). Shilpa and the Individual Defendants egregiously violated this duty of candor.

89. The Patent Office justifiably relied on Shilpa's and the Individual Defendants' misrepresentations, and the 816 Patent would not have issued but for these highly material omissions and misrepresentations.

**The Market for Gilenya Technology**

90. The relevant geographic market is the United States and its territories as a whole.

91. There currently exists a market for the right to commercialize Gilenya or generic equivalents in the next few years. Indeed, Novartis has licensed its rights to manufacture Gilenya's components to multiple companies, and other aspects of the technology needed to manufacture the drug are available for license or purchase. Shilpa is aware of that fact, and in its initial discussions with Novartis about the 816 Patent in 2016, suggested that Novartis should license the Patent to attempt to maintain exclusivity over the U.S. through 2031, the 816 Patent's expiration date.

92. Due to the peculiar characteristics of this market for Gilenya technology, it is especially susceptible to certain types of anticompetitive conduct. Shilpa's and the Individual

Defendants' wrongful conduct in obtaining the otherwise invalid or unenforceable 816 Patent constitutes a monopoly of this market.

93.     In particular, Shilpa's claim that Form beta is equivalent to Form I means that, if correct, Shilpa would have exclusive rights to an essential component in the technology to commercialize Gilenya or a generic equivalent. FDA has approved Gilenya for sale as a solid oral treatment for RRMS. The drug label contains no requirement for refrigeration or heating. The storage and handling of Gilenya is specified to be at 25°C, which is around room temperature, and allows for excursions to 15-30°C. Accordingly, the drug will be used at around room temperature and will necessarily contain Form I. Given that, generic equivalents will contain Form I. Insofar as Shilpa alleges that Form beta and Form I are the same, Shilpa thus has an illegal and improper monopoly on technology essential for the commercialization of Gilenya or generic equivalents by virtue of the 816 Patent.

94.     There is thus no substitute for the 816 Patent—according to Shilpa, it covers the only polymorph that can be used in Gilenya or a generic equivalent. No other company would be able to commercialize Gilenya or a generic equivalent until 2031 without a license from Shilpa. The patent is, in a word, essential for making Gilenya or a generic equivalent.

**Shilpa's Abuse of Market Power and Novartis's Antitrust Injury**

95.     Nor would consumers be able to easily switch away from Gilenya to restrain the abuse of market power. Patients already on Gilenya are unlikely to be switched to a different drug, as doctors are resistant to switching drugs that work for an RRMS patient. Gilenya is also the only drug in its therapeutic class with a track record for safety and efficacy of almost 12 years.

96.     Accordingly, the demand for Gilenya is inelastic, so the market is unable to meaningfully constrain Shilpa's market power through substitution. That market power will allow Shilpa to extract monopoly rents through license fees for the right to use the improperly obtained

816 Patent. In addition, technology licensing fees are a small portion of the overall cost of commercializing Gilenya, compared to the other costs involved in research and development; sales and marketing; physician and patient education; and the programs needed to support patients in starting and continuing to take Gilenya.

97. Novartis has been injured by reason of Shilpa's antitrust violations. For example, Shilpa's lawsuit forces Novartis to choose between exiting the market, buying a license from Shilpa, or spending substantial resources defending itself against Shilpa's infringement action. Indeed, Novartis has already spent substantial resources to defend itself in this action.

98. These injuries are of the type the antitrust laws were designed to prevent and flow directly from that which makes Shilpa's conduct unlawful. Novartis is a consumer and user in the market for the technology needed to commercialize Gilenya, and consumers are the core group protected by the Sherman Act. Shilpa's improperly obtained monopoly power, and the injuries to Novartis, would not exist but for Shilpa's fraudulent conduct before the Patent Office and decision to file this lawsuit against Novartis.

99. Novartis has also suffered other damages directly and proximately caused by Shilpa's conduct, including lost goodwill among potential and actual customers due to uncertainty surrounding Gilenya and reputational harm to Novartis resulting from the lawsuit.

100. Section 4 of the Clayton Act, 15 U.S.C. § 15, entitles Novartis to treble the amount of its actual damages attributable to Shilpa's unlawful monopolization in an amount to be determined at trial, plus the cost of suit, including reasonable attorneys' fees.

101. Section 16 of the Clayton Act, 15 U.S.C. § 26, entitles Novartis to an injunction preventing and restraining Shilpa's conduct in violation of Section 2 of the Sherman Act, and to an award of the cost of suit, including reasonable attorneys' fees.

32

## FIFTH COUNTERCLAIM

### (Attempted Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 – *Walker Process* Fraud and Sham Litigation)

102.     Novartis restates and realleges the allegations of the preceding Paragraphs of its Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

103.     Shilpa has a dangerous probability of obtaining improper monopoly power by virtue of its lawsuit against Novartis asserting infringement of its fraudulently obtained patent.

104.     Shilpa and the Individual Defendants have engaged in the anticompetitive and exclusionary practices previously alleged with the specific purpose and intent of obtaining monopoly power in the market for Gilenya technology, including filing a sham litigation against Novartis asserting infringement of a patent it knows was obtained by fraud.

105.     As described above, Shilpa and the Individual Defendants procured the 816 Patent by knowing and willful fraud before the Patent Office.  This includes blatantly omitting material information relating to and mischaracterizing the prior art in the 816 Patent, submitting a false and misleading comparison of the claimed crystal form to a prior art crystal form applied by the Examiner to reject the claims, and breaching promises to the Patent Office in expanding the claims' scope.

106.     Shilpa and the Individual Defendants then attempted to improperly monopolize the Gilenya technology market by bringing an objectively baseless action for infringement against Novartis on a patent they know was obtained by fraud and is unenforceable and invalid. Shilpa brought its sham litigation for the improper purpose of harming Novartis and reducing or eliminating competition in the relevant market.

107.     As a direct result of Shilpa's attempted monopolization, Novartis has been injured in its business and property, as previously alleged.  Novartis's injuries directly result from Shilpa's

unlawful conduct and are injuries of the type the antitrust laws were intended to prevent and which flow from that which makes Shilpa's conduct unlawful.

108.     Section 4 of the Clayton Act, 15 U.S.C. § 15, entitles Novartis to treble the amount of its actual damages attributable to Shilpa's unlawful monopolization in an amount to be determined at trial, plus the cost of suit, including reasonable attorneys' fees.

109.     Section 16 of the Clayton Act, 15 U.S.C. § 26, entitles Novartis to an injunction preventing and restraining Shilpa's conduct in violation of Section 2 of the Sherman Act, and to an award of the cost of suit, including reasonable attorneys' fees.

## SIXTH COUNTERCLAIM

### (Violation of State Antitrust Law)

110.     Novartis restates and realleges the allegations of the preceding Paragraphs of its Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

111.     Shilpa's anticompetitive and exclusionary practices were undertaken with the specific purpose and intent of obtaining monopoly power constitute a violation of state antitrust law.

112.     For the same reasons as with the Sherman Act, Novartis is entitled to an injunction preventing and restraining Shilpa's conduct in violation of state antitrust law, and to an award of the cost of suit, including reasonable attorneys' fees.

## SEVENTH COUNTERCLAIM

### (Unfair Competition under State Law)

113.     Novartis restates and realleges the allegations of the preceding Paragraphs of its Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

114.     Shilpa and the Individual Defendants have wrongly interfered with Novartis' valid business relationships with customers and potential customers for the technology needed to

commercialize Gilenya, including generic drug makers. Assertion of the fraudulent 816 Patent would render the rights Novartis has licensed to those companies effectively worthless, and amount to a misappropriation of Novartis' otherwise valid intellectual property rights in Gilenya.

115. Novartis has a reasonable expectancy of entering and continuing valid business relationships with customers for the technology needed to commercialize Gilenya. Novartis's licensing agreements with these companies will continue for years. Shilpa violated state common unfair competition law through Shilpa's bad faith filing of the present lawsuit.

116. Evidence of Shilpa's bad faith in filing the present lawsuit is described in the above paragraphs and includes, *inter alia*, asserting a patent that Shilpa knew was obtained by fraud, and by asserting as a basis for infringement by Novartis that the fingolimod product disclosed by Novartis in the prior art meets the asserted claims.

## PRAYER FOR RELIEF ON NOVARTIS'S COUNTERCLAIMS

WHEREFORE, Novartis seeks the following relief:

A. Judgment against Shilpa and the Individual Defendants and in favor of Novartis on all counts

B. Judgment that the 816 patent and all of its claims are invalid and/or unenforceable;

C. Judgment that Novartis does not infringe any valid and enforceable claim of the 816 patent;

D. A dismissal, with prejudice, of Shilpa Pharma's claims against Novartis;

E. That Shilpa Pharma take nothing by reason of its Complaint;

F. That Novartis be awarded treble damages in an amount to be determined at trial;

35

G.  That an injunction be entered preventing and restraining Shilpa's and the
Individual Defendants' conduct in violation of Section 2 of the Sherman Act and
State law;

H.  That pursuant to 35 U.S.C. § 285 and any other applicable laws including
Sherman Act, Novartis be awarded its attorneys' fees incurred in connection with
this action;

I.  That the Court award Novartis its costs of suit; and

J.  That Novartis be awarded such other and further relief as the Court deems just
and proper, including but not limited to punitive damages on Novartis's State law
claims.

## JURY DEMAND

Novartis hereby demands a trial by jury on all issues so triable.

36

DATED: March 30, 2022

McCARTER & ENGLISH, LLP

/s/ *Daniel M. Silver*

OF COUNSEL:

Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

Jane M. Love, Ph.D.
Robert W. Trenchard
Paul E. Torchia
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000
jlove@gibsondunn.com
rtrenchard@gibsondunn.com
ptorchia@gibsondunn.com

*Counsel for Defendant*
*Novartis Pharmaceuticals Corporation*

David Glandorf
GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Suite 4200
Denver, CO 80202-2642
dglandorf@gibsondunn.com

37